FILED
2024 Sep-13  PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| KEITH LEONARD KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:23-cv-01303-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER
### <u>AFFIRMING THE DECISION OF THE COMMISSIONER</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff Keith Leonard King filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for continued disability benefits. Doc. 1.  On February 16, 2007, Plaintiff King was found eligible for disability benefits beginning on May 2, 2005.  Doc. 7-1 at 23, 215.  But on August 7, 2023, the Commissioner issued a decision finding that King no longer was disabled as of April 1, 2019.  Doc. 7-1 at 38.  In this appeal, the parties consented to magistrate judge jurisdiction.  Doc. 9; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUE FOR REVIEW

In this appeal, King argues that the court should reverse the Commissioner's decision because the Administrative Law Judge (ALJ) erred in the weight afforded to the opinions of Donald W. Blanton, Ph.D., "despite his inability to review relevant intelligence testing that would seem to contradict his findings."  Doc. 10 at 1.

## STATUTORY AND REGULATORY FRAMEWORK

When applying for Social Security disability benefits, a claimant bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505.

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:   (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council.

*See* 20 C.F.R. § 404.900(a)(1)–(4).

When an initial claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)     whether the claimant is engaged in substantial gainful activity;

(2)     if not, whether the claimant has a severe impairment or combination of impairments;

(3)     if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)     if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,

(5)     if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

But when the issue is the continuation (or cessation) of previously granted disability benefits, an ALJ must follow a different evaluation process to determine whether a claimant's disability benefits should continue.  *See* 20 C.F.R. § 404.1594(f).  After an individual successfully applies for and is awarded Social Security benefits, the Commissioner periodically evaluates whether continuing benefits are warranted.  20 C.F.R. § 404.1594(a).  The Commissioner may terminate a claimant's benefits if substantial evidence demonstrates that the physical or mental

impairment for which benefits initially were provided has ceased, does not exist, or no longer is disabling.  42 U.S.C. § 423(f).

In this regard, the Commissioner has established an eight-step sequential evaluation process for determining whether a claimant's disability has ended.  20 C.F.R. § 404.1594(f).  This eight-step continuing disability review process is similar to the five-step sequential evaluation process used for initial claims for benefits, with additional attention paid to whether there has been "medical improvement."  *See* 20 C.F.R. §§ 404.1520, 404.1594(f).  The ALJ must determine the following:

(1)    whether the claimant is engaging in substantial gainful activity;

(2)    if not gainfully employed, whether the claimant has an impairment or combination of impairments which meets or equals a listing;

(3)    if impairments do not meet a listing, whether there has been medical improvement;

(4)    if there has been improvement, whether the improvement is related to the claimant's ability to do work;

(5)    if there is improvement related to the claimant's ability to do work, whether an exception to medical improvement applies;

(6)    if medical improvement is related to the claimant's ability to do work, or if one of the first groups of exceptions to medical improvement applies, whether the claimant has a severe impairment;

(7)    if the claimant has a severe impairment, whether the claimant can perform past relevant work; and,

(8)    if the claimant cannot perform past relevant work, whether the claimant can perform other work.

20 C.F.R. § 404.1594(f).

Medical improvement is a "decrease in the medical severity" of impairments that were present when the Commissioner last determined that the recipient was disabled or continued to be disabled; "[a] determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." 20 C.F.R. § 404.1594(b)(1). The ALJ must determine that there has been medical improvement before then proceeding with the remaining steps of the evaluation process. *See* 20 C.F.R. § 404.1594(f)(3).

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.**    With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## BACKGROUND

### A.     Initial award of benefits

On February 16, 2007, King was awarded disability benefits when an ALJ issued a fully favorable decision, finding that King was disabled beginning on April 9, 2005. Doc. 7-1 at 128. In that decision, based on testimony and medical evidence, the ALJ found that King was disabled in light of his intellectual function and IQ tests. Doc. 7-1 at 131. The ALJ found that King was disabled because he "obtained a verbal IQ score of 52, performance IQ score of 50, and a full scale IQ score of 46, an indication of [what was then referred to as] mental retardation." Doc. 7-1 at 131; *see* Doc. 10 at 2. The ALJ found that King's "impairment causes significant limitation in [his] ability to perform basic work activities." Doc. 7-1 at 130.

### B.     Cessation of benefits proceedings

On March 15, 2019, the SSA notified King of its decision to end his disability payments beginning May 2015 due to substantial work. Doc. 7-4 at 8. On May 27, 2019, the SSA notified King that he would receive provisional disability benefits while his request for reinstatement of benefits was being decided. Doc. 7-4 at 17. On August 8, 2019, the SSA notified King that his request for reinstatement of benefits was denied. Doc. 7-4 at 26. King requested a hearing with an ALJ. Doc. 7-5 at 17.

On January 6, 2022, after conducting a hearing on November 3, 2021 (Doc.

7-1 at 96–121), an ALJ entered an unfavorable decision, finding that King's disability had "ended on April 1, 2019." Doc. 7-1 at 152. But on April 6, 2022, the Appeals Council remanded that decision back to an ALJ for further consideration, ruling that the ALJ should have evaluated the opinion evidence using the prior rules (20 C.F.R. § 404.1527), rather than the current rules (20 C.F.R. § 404.1520c). Doc. 7-1 at 156.

On July 6, 2022 (on remand), another ALJ conducted a hearing (Doc. 7-1 at 73–93), and then issued a second unfavorable decision, finding that King's "disability ended on April 1, 2019." Doc. 7-1 at 175. But on November 18, 2022, the Appeals Council again remanded that decision back to the ALJ for further consideration because "the hearing decision [did] not contain an adequate evaluation of whether the claimant experienced medical improvement." Doc. 7-1 at 190.

### C.    ALJ hearing on June 27, 2023

On June 27, 2023 (on remand for the second time), the ALJ conducted another hearing. Doc. 7-1 at 52. At the hearing, King testified that he tried to return to work in 2021, but that he "couldn't complete the job," "couldn't understand how to do the job," and "couldn't catch on quick like the other workers could." Doc. 7-1 at 60. King also testified that his mother and sister help him with going to the doctor, paying bills, cooking, bathing, buying clothes, and washing clothes. Doc. 7-1 at 61.

King testified that he has a current driver's license, but that he no longer

drives.  Doc. 7-1 at 63.  King also testified that, when he took the test to obtain his driver's license, someone assisted him with the reading and writing components of the test.  Doc. 7-1 at 63.  King testified further that he took the driver's license test "three or four times" before passing.  Doc. 7-1 at 64.

As to his work history, King testified that he did "janitor work for three months," "cut grass for about a month and a half," and "manufactured plywood for about two to three months."  Doc. 7-1 at 66.

At the hearing, vocational expert (VE) Donald Woodall opined that an individual with King's residual functional capacity (RFC) could work medium level jobs, such as a janitor, groundskeeper, kitchen helper, or hand packager.  Doc. 7-1 at 68.

### D.    ALJ decision

On August 7, 2023, the ALJ entered an unfavorable decision on King's eligibility for continued benefits.  Doc. 7-1 at 23–38.  The ALJ found that King's "disability ended on April 1, 2019, and [King] has not become disabled again since that date."  Doc. 7-1 at 38.

In the decision, the ALJ applied the eight-step evaluation process for assessing whether disability benefits should continue (*see* 20 C.F.R. §404.1594(f)).  Doc. 7-1 at 24–25.  The ALJ found that King's comparison point decision (CPD), which is the most recent favorable medical decision finding disability, was the decision dated

February 16, 2007.  Doc. 7-1 at 25.  The ALJ found that at the time of the February 16, 2007 decision, King suffered from "intellectual disability (then referred to as mental retardation)," and that King had not engaged in substantial gainful activity through the date of the August 7, 2023 decision.  Doc. 7-1 at 23, 25; *see* Doc. 10 at 2.

The ALJ found that, since April 1, 2019, King had the following medically determinable impairments:  "mild intellectual disability; scoliosis; left ankle sprain; sinusitis; effusion of the right knee; and dental abscess."  Doc. 7-1 at 25.

In making that finding, the ALJ summarized and considered King's consultative examination by Teresa Davis, Psy.D. from June 14, 2019.  Doc. 7-1 at 26.  The ALJ summarized that during Dr. Davis' examination, King "had fair hygiene" and was described as alert, engageable, talkative with mild articulation issues, and usually cheerful or happy but irritable at times.  Doc. 7-1 at 26.  Further, King's "thought processes showed some distraction, tangential thinking, and confusion."  Doc. 7-1 at 26.  The ALJ noted that King completed intelligence testing with Dr. Davis and had a full scale IQ score of 46, which "was in the extremely low range."  Doc. 7-1 at 26.  The ALJ summarized King's reports to Dr. Davis, primarily that King "has been fired from jobs and has lots of arguments with cashiers and store clerks" and that "he is able to complete housework and help with yard work."  Doc. 7-1 at 26.  The ALJ considered Dr. Davis' diagnostic impression of King, which was

that King "appears to be able to understand some simple, verbal instructions but would have significant difficulty understanding more complex and written instructions." Doc. 7-1 at 26.

The ALJ summarized King's fourteen medical visits to Neshoba County General Hospital and Neshoba Urgent Care between June 24, 2019, and April 14, 2022, during which King repeatedly was described as cooperative with an appropriate mood and affect. Doc. 7-1 at 26–28.

The ALJ also summarized King's consultative examination by Dr. Blanton on April 25, 2023 Doc. 7-1 at 28–29. During that examination, King reported that he "has never been in a mental hospital and that he has not seen a psychiatrist since 2005." Doc. 7-1 at 28. King reported to Dr. Blanton that "he has mood swings from really angry to normal," and Dr. Blanton found that King was "a poor historian who had a difficult time describing his problems." Doc. 7-1 at 28. The ALJ stated that Dr. Blanton described King "as doing deliberately poorly during cognitive testing." Doc. 7-1 at 28.

The ALJ summarized further Dr. Blanton's findings that King's "thoughts and conversation were logical," and King's "affect was flat but appropriate." Doc. 7-1 at 28. The ALJ stated that Dr. Blanton found "no evidence of any hallucinations, delusions, or paranoia," and that King "was alert, oriented to time, place, person, and situation." Doc. 7-1 at 28. The ALJ found that King reported to Dr. Blanton that he

was unable to do housework or cook, never learned to drive, could not count or handle money, had no friends, could not read, and did not know how to use his cell phone for texting or playing games.  Doc. 7-1 at 28–29.

Citing a third party function report by King's mother, the ALJ found that King's mother reported that King "has no problem with personal care" and "can shop in stores and drive."  Doc. 7-1 at 29.

The ALJ found that while King has alleged "some problems with authority figures because of his intellectual impairment," King "denied problems getting along with family, friends, neighbors, or others" and "was generally described as cooperative with an appropriate mood and affect in treatment records."  Doc. 7-1 at 30.

The ALJ also found that since April 1, 2019, King did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations.  Doc. 7-1 at 29.

The ALJ found further that "[m]edical improvement occurred on April 1, 2019."  Doc. 7-1 at 30.  The ALJ stated that King initially was found disabled because of low IQ score, but "there is indication that his intellectual disability has improved since that time."  Doc. 7-1 at 31.  The ALJ found that despite King's low IQ scores, King can follow simple instructions, is independent with daily living activities, and has been able to work despite his intellectual function.  Doc. 7-1 at

31.

The ALJ found that King's "medical improvement is related to the ability to work because, by April 1, 2019, [King's] CPD impairment(s) no longer met or medically equaled the same listing that was met at the time of the CPD."  Doc. 7-1 at 31.  The ALJ determined that when King initially was found disabled he had both a full scale IQ score of 46 and "deficits in adaptive functioning," but that King has experienced significant medical improvement and no longer has significant deficits in adaptive functioning.  Doc. 7-1 at 32.  The ALJ concluded that King "has experienced significant medical improvement such that he no longer meets the requirements" of the standards for intellectual disabilities that were in place at the time King initially was found disabled.  Doc. 7-1 at 32.

After finding that King had experienced medical improvement, the ALJ concluded that King still had the severe impairments of intellectual disability and scoliosis.  Doc. 7-1 at 32.  Accordingly, the ALJ found that King had the RFC to perform medium work, finding that King can frequently climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can frequently stoop, kneel, crouch or crawl; is limited to no exposure to unprotected heights, hazardous machinery, or commercial driving; is able to understand and remember simple instructions; can maintain attention and consideration to carry out simple instructions; can maintain attention and concentration to carry out simple instructions in at least 2 hour intervals

over an 8 hour workday with customary breaks; can have occasional interaction with the general public; and can adapt to occasional changes in the work environment. Doc. 7-1 at 33.

In determining King's RFC, the ALJ considered King's November 2021 hearing testimony that he could read simple things, write his name, add and subtract "a little," could make change with a $20 bill "if he took his time and wrote it down," and passed the oral driver's test. Doc. 7-1 at 33. The ALJ also considered King's testimony from the July 6, 2022 ALJ hearing, where King testified that he could do simple math, was easily distracted, and could do chores, prepare meals, or go grocery shopping. Doc. 7-1 at 34. The ALJ considered further King's testimony from the June 27, 2023 ALJ hearing, where he testified that his mother and sister helped him read and understand forms and that he took his driver's test 3 or 4 times, but someone had to read his driver's test to him in order for him to pass. Doc. 7-1 at 34.

The ALJ stated that, in making the RFC determination, the ALJ "considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527." Doc. 7-1 at 33.

The ALJ afforded great weight to the opinion of Dr. Davis that King "would be able to understand simple verbal instructions." Doc. 7-1 at 35. The ALJ found that King's work history of several unskilled and lower skilled jobs supported Dr. Davis' finding that King could understand and remember simple instructions. Doc.

7-1 at 35.

With regard to King's ability to respond appropriately to coworkers and supervisors, the ALJ gave only some weight to the opinion of Dr. Davis that King's ability to respond may be impaired.  Doc. 7-1 at 35.  In weighing Dr. Davis' opinion, the ALJ found that King's report to Dr. Davis that he is easily agitated when interacting with others was not entirely consistent with the rest of the record.  Doc. 7-1 at 35.

The ALJ afforded great weight to Dr. Blanton's opinion that King was "likely malingering/exaggerating his symptoms."  Doc. 7-1 at 35–36.  The ALJ found that Dr. Blanton's opinion that King was malingering "is consistent with [Dr. Blanton's] own examination of [King] and consistent with the rest of the record including [King's] work activity and reported activities of daily living which do not support [King's] presentation at the consultative examination."  Doc. 7-1 at 36.

The ALJ summarized Dr. Blanton's opinion that due to King's low IQ, King "has a mild limitation in understanding and remembering simple instructions, carrying out simple instructions, and in the ability to make judgments on simple work-related decisions."  Doc. 7-1 at 35.  The ALJ also summarized Dr. Blanton's opinion that, due to King's low IQ, King "has moderate limitation in understanding and remembering complex instructions, carrying out complex instructions, and in

the ability to make judgments on complex work-related decisions." Doc. 7-1 at 35.[1]

The ALJ found that "Dr. Blanton's finding that [King] has no greater than mild to moderate limitation is afforded good weight because it is supported by adequate explanation and is consistent with [King's] reported activities." Doc. 7-1 at 36.

Based on King's updated, improved RFC, the ALJ found that King has been able to perform past relevant work since April 1, 2019. Doc. 7-1 at 36.

The ALJ went on to find that, considering King's age, education, work experience, and RFC based on his impairments since April 1, 2019, King has been able to perform a significant number of jobs in the national economy. Doc. 7-1 at 37.

The ALJ then found that King's disability ended on April 1, 2019, and that King has not become disabled again since that date. Doc. 7-1 at 38.

---

[1] "Dr. Blanton opined that the claimant is likely malingering/exaggerating his symptoms as noted above (Exhibit B16F). He also found that the claimant has a mild limitation in understanding and remembering simple instructions, carrying out simple instructions, and in the ability to make judgments on simple work-related decisions. He stated that the claimant has moderate limitation in understanding and remembering complex instructions, carrying out complex instructions, and in the ability to make judgments on complex work-related decisions. He cited the claimant's low IQ as the reason for these limitations. Dr. Blanton opined that the claimant has mild limitations in his ability to interact appropriately with the public and supervisors and moderate limitation in the ability to interact appropriately [with] coworkers or respond appropriately to usual work[] situations citing the mental status examination." Doc. 7-1 at 35.

E.      **Appeals Council decision**

King sought review from the Appeals Council of the ALJ's unfavorable decision, stating that he disagreed with the ALJ's determination of his claim.  Doc. 7-1 at 16–19.  On September 20, 2023, the Appeals Council denied King's request for review, finding no reason to review the ALJ's decision.  Doc. 7-1 at 8.  Because the Appeals Council declined to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.  Doc. 7-1 at 8.

## DISCUSSION

In this appeal, King argues that the ALJ erred in the weight afforded to the opinions of Dr. Blanton.  Doc. 10 at 4.  Specifically, King argues that Dr. Blanton's opinions should have been given less weight because of his "inability to review relevant intelligence testing that would seem to contradict his findings."  Doc. 10 at 4.  King argues that, without reviewing King's IQ test results, Dr. Blanton's "conclusions [were] suspect at best," and "Dr. Blanton's medical opinion was clearly not based upon the totality of the relevant medical evidence available."  Doc. 10 at 8–9; *see also* Doc. 10 at 10–11 (similar).

Having carefully considered the record and the briefing, the court affirms the ALJ's decision.  The ALJ properly weighed the opinions of Dr. Blanton based upon the proper legal standards, and substantial evidence supports the ALJ's findings as to Dr. Blanton's opinions.  *See Lewis*, 125 F.3d at 1439.

As a preliminary matter, King does not challenge the ALJ's findings that King's impairments no longer met any listing in the Social Security regulations, or that there had been medical improvement related to King's ability to do work. *See* Doc. 7-1 at 29–32. Rather, King challenges only the weight that the ALJ afforded to Dr. Blanton's opinions as part of the ALJ's RFC finding. *See* Doc. 7-1 at 33–36.

Importantly, "the final responsibility for deciding" issues like a claimant's RFC "is reserved to the Commissioner," not any medical source. 20 C.F.R. § 404.1527(d)(2). An ALJ "use[s] medical sources . . . to provide evidence, including opinions, on the nature and severity of [the claimant's] impairment(s)." *Id.* Likewise, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled." 20 C.F.R. § 404.1527(d)(1). That is because opinions about whether a claimant is disabled, the claimant's RFC, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Any such statement from a medical source may be relevant to the ALJ's findings but is not determinative, because it is the ALJ who must find the claimant's RFC. *See, e.g.*, 20 C.F.R. § 404.1546(c). In other words, the "task of determining a claimant's residual functional capacity and ability to work rests with the [ALJ], not a doctor." *Moore v. Social Sec. Admin., Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016); *see*

18

*also* 20 C.F.R. § 404.1546(c) ("If your case is at the [ALJ] hearing level . . . , the [ALJ] . . . is responsible for assessing your residual functional capacity.").

In this regard, the ALJ's decision was based upon proper legal standards. *See Lewis*, 125 F.3d at 1439.

As noted above, the ALJ's decision states that the ALJ considered the opinion evidence, including Dr. Blanton's opinions, according to 20 C.F.R. § 404.1527. Doc. 7-1 at 33.[2]

Under 20 C.F.R. § 404.1527(b), an ALJ considers the medical opinions in the record together with the rest of the relevant evidence in determining whether the claimant is disabled. *Id.* When weighing medical opinions, the ALJ gives more weight to opinions from medical sources who have examined or treated a claimant, considering the length, nature, and extent of the treatment relationship. 20 C.F.R. § 404.1527(c)(1)–(2). Further, the ALJ gives medical opinions more weight when a medical source presents relevant evidence to support the opinion, when the medical opinion is consistent with the record as a whole, and when the medical source is a specialist. 20 C.F.R. § 404.1527(c)(3)–(5).

---

[2] Because King filed his claim for disability benefits prior to March 27, 2017, 20 C.F.R. § 404.1527 applies. *See, e.g.*, Doc. 7-1 at 156 (Appeals Council order remanding because the ALJ's decision "contains an evaluation of opinion evidence pursuant to 20 C.F.R. § 404.1520c (current rules) instead of 20 C.F.R. § 404.1527 (prior rules)," and finding that "the comparison point decision is before March 27, 2017").

In this case (as explained above), and pursuant to 20 C.F.R. § 404.1527(c), the ALJ found that "Dr. Blanton's opinion that [King] is malingering is afforded great weight because it is consistent with [Dr. Blanton's] own examination of [King] and consistent with the rest of the record including his work activity and reported activities of daily living which do not support [King's] presentation at the consultative examination." Doc. 7-1 at 36 (citing exhibits); *see* 20 C.F.R. § 404.1527(c)(3) (supportability); *id.* § 404.1527(c)(4) (consistency). The ALJ also found that "Dr. Blanton's finding that [King] has no greater than mild to moderate limitation is afforded good weight because it is supported by adequate explanation and is consistent with [King's] reported activities discussed at length" in the ALJ's decision. Doc. 7-1 at 36; *see* 20 C.F.R. § 404.1527(c)(3) (supportability); *id.* § 404.1527(c)(4) (consistency).

In addition, substantial evidence supports the ALJ's findings with respect to Dr. Blanton's opinions. *See Lewis*, 125 F.3d at 1439. King does not argue that Dr. Blanton's opinions were not adequately supported by his own examination and explanation. *See* 20 C.F.R. § 404.1527(c)(3) (supportability). Instead, King argues that, without reviewing King's intelligence testing scores, "Dr. Blanton's medical opinion was clearly not based upon the totality of the relevant medical evidence available." Doc. 10 at 9; ; *see* 20 C.F.R. § 404.1527(c)(4) (consistency).

As noted above, Dr. Blanton examined King on April 25, 2023, on a referral

by the SSA for a mental evaluation without testing.  Doc. 7-9 at 15.  Dr. Blanton

noted that "there were no records available at the time of this interview."  Doc. 7-9

at 15.  Among other things, Dr. Blanton found that King was unable to recite his

Social Security number, could not spell the word "world," and could not describe

the similarities between an orange and a banana.  Doc. 7-9 at 16.  Dr. Blanton also

found that King could not describe the colors in the American flag and reported that

the shape of a ball was a square.  Doc. 7-9 at 16.  Dr. Blanton found further that King

reported that he "never learned to drive," "does not do housework or cooking,"

"cannot count or handle money," and "does not read" and "cannot read."  Doc. 7-9

at 16.

Dr. Blanton found that King "appeared to do deliberately poorly during the

cognitive portion of the mental status examination bringing all of his reported

symptoms into question."  Doc. 7-9 at 16.

Dr. Blanton's clinical impressions of King were "malingering" and

"intellectual disability, mild to moderate, provisional."  Doc. 7-9 at 16.

Dr. Blanton's findings were consistent with the record as a whole.  *See* 20

C.F.R. § 404.1527(c)(4) (consistency) ("Generally, the more consistent a medical

opinion is with the record as a whole, the more weight [an ALJ] will give to that

medical opinion.").

In particular, substantial evidence supports the ALJ's finding that Dr.

Blanton's opinion of malingering was "consistent with the rest of the record including his work activity and reported activities of daily living which do not support [King's] presentation at the consultative examination."  Doc. 7-1 at 36; *see* 20 C.F.R. § 404.1527(c)(4) (consistency).  For instance, the ALJ found that, while King reported to Dr. Blanton that he could not read (Doc. 7-1 at 28–29), King reported to Dr. Davis that he had problems reading (Doc. 7-1 at 26), and King testified at his November 2021 hearing that "he could read simple things and that he could write his name" (Doc. 7-1 at 33).  The ALJ found that, at King's hearing on June 27, 2023, King testified that "his mother and sister had to help him reading and understanding forms."  Doc. 7-1 at 34.

The ALJ also found that, while King reported to Dr. Blanton that he could not count or handle money (Doc. 7-1 at 29), King reported to Dr. Davis that his mother was "teaching him how to manage his money" (Doc. 7-1 at 26), and King testified at his November 2021 hearing "that he could make change with a $20.00 bill if he took his time and wrote it down."  Doc. 7-1 at 33.

The ALJ found further that, while King reported to Dr. Blanton that "he has never learned to drive" (Doc. 7-1 at 18), in a third party function report King's mother reported that King "can shop in stores and drive."  Doc. 7-1 at 29.  The ALJ found that at King's November 2021 hearing King "reported that he passed the oral driver's test" (Doc. 7-1 at 33), and at his hearing on June 27, 2023, King "indicated

that someone had to read to him from the driver's license test for him to pass it and that he had to take it 3 or 4 times" (Doc. 7-1 at 34).  Thus, substantial evidence supports the ALJ's finding that Dr. Blanton's opinion of malingering was consistent with the rest of the record, which did not support King's presentation at the consultative examination, because there "is such relevant evidence as a reasonable person would accept as adequate to support" the ALJ's finding.  *See Crawford*, 363 F.3d at 1158.

Likewise, substantial evidence supports the ALJ's finding that Dr. Blanton's opinion of King's mild to moderate intellectual disability was consistent with the record as a whole.  Doc. 7-1 at 36; *see* 20 C.F.R. § 404.1527(c)(4) (consistency).  The ALJ correctly found that Dr. Blanton's opinion regarding King's ability to interact with others was consistent with the record as a whole.  The ALJ found that King "has moderate limitation" in interacting with others.  Doc. 7-1 at 30.  In making that determination, the ALJ gave "only some weight" to Dr. Davis' opinion that King's "ability to respond appropriately to coworkers and supervisors may be impaired."  Doc. 7-1 at 35.  The ALJ found that King's function report shows that "he gets along well with others," and that King's treatment records show that "he was generally described as cooperative."  Doc. 7-1 at 35 (citing exhibits).  The ALJ summarized Dr. Blanton's opinion that King "has mild limitations in his ability to interact appropriately with the public and supervisors and moderate limitation in the

ability to interact appropriately [with] coworkers." Doc. 7-1 at 35. Nevertheless, consistent with Dr. Blanton's opinion and the record as a whole, the ALJ "limited [King] to only occasional interaction with the general public to accommodate any problems interacting with others." Doc. 7-1 at 35.

King also argues that his previous IQ test scores "seem to contradict" Dr. Blanton's findings. Doc. 10 at 4. But the ALJ correctly found that, while Dr. Blanton did not conduct IQ testing or review King's previous IQ test scores, Dr. Blanton cited King's "low IQ" as the reason for King's mild limitation in understanding, remembering, and carrying out simple instructions and his moderate limitation in understanding, remembering, and carrying out complex instructions. Doc. 7-1 at 36; *see also* Doc. 7-1 at 18 (Dr. Blanton notation of "low IQ" as reason on medical source statement).

Moreover (as discussed above), the "task of determining a claimant's residual functional capacity and ability to work rests with the [ALJ], not a doctor" (*see Moore*, 649 F. App'x at 945), and the ALJ's decision shows that the ALJ found King's RFC "based on all the evidence," including King's IQ testing and scores. *See* Doc. 7-1 at 33.

Indeed, the ALJ found that the "reports regarding [King's] activities and retained abilities and his work activity indicate that his functioning is far more advanced than the full scale IQ scores would indicate." Doc. 7-1 at 32; *see also,*

*e.g.*, Doc. 7-1 at 26 ("He completed Weschler Adult Intelligence Scale fourth edition (WAIS-V) testing and had a full-scale IQ of 46 which was in the extremely low range."); Doc. 7-1 at 29 ("The record indicates that the claimant has been able to participate in standardized testing of intellectual functioning" (citing Dr. Davis' report)); Doc. 7-1 at 29 ("The claimant has alleged problems understanding and with his memory, and testing showed memory deficits and a low IQ" (citing exhibits)); Doc. 7-1 at 30 (noting King's "low IQ score"); Doc. 7-1 at 31 (stating that King "was initially found disabled because of a low IQ score," and that, "[d]espite an indication that the claimant has low IQ scores, Dr. Davis found that the claimant is able to understand, remember, and carry out simple instructions"); Doc. 7-1 at 32 ("In the most recent IQ testing, the claimant was described as having a full-scale IQ score of 46 . . . ."); Doc. 7-1 at 34 ("Testing showed his reasoning ability, his ability to sustain attention, concentration, and exert mental control, and his full scale IQ to be in the extremely low range" (citing Dr. Davis' report)).

Furthermore, King argues that Dr. Davis "did have the benefit of the intelligence test results" and "clearly note[d] more severe restrictions than did Dr. Blanton who was without the benefit of these scores to consider." Doc. 10 at 10. But (again), the "task of determining [King's] residual functional capacity and ability to work rests with the [ALJ]," and not any medical source. *See Moore*, 649 F. App'x at 945. As discussed above, substantial evidence supports the ALJ's

finding to give "only some weight" to Dr. Davis' opinion that King's "ability to respond appropriately to coworkers and supervisors may be impaired," because the ALJ found that King's function report shows that "he gets along well with others," and that King's treatment records show that "he was generally described as cooperative."   Doc. 7-1 at 35 (citing exhibits).   And, in any event, the ALJ incorporated this impairment into the RFC finding, and "limited [King] to only occasional interaction with the general public to accommodate any problems interacting with others."  Doc. 7-1 at 35.

Plus, the ALJ "afford[ed] great weight to the opinion of Dr. Davis indicating that [King] would be able to understand simple verbal instructions because it is consistent with valid testing and [King's] report to Dr. Davis that he is able to perform his activities of daily living."  Doc. 7-1 at 35.  And (as King points out in briefing, *see* Doc. 10 at 6, 11), the ALJ found that Dr. Davis had reviewed King's previous IQ testing with Brent R. Willis, Psy.D., and administered an IQ test to King. Doc. 7-1 at 26 ("Previous Weschler Adult Intelligence Scale-III (WAIS-III) testing showed the claimant to have a full-scale score of 46."); *see also* Doc. 7-1 at 36 (ALJ finding that "affords little weight to the consultative examination[]" of Dr. Willis because it was "remote" (citing Exhibit B2F)).  As with Dr. Blanton, the ALJ found that Dr. Davis' diagnostic impression of King was "intellectual deficit, mild," and that Dr. Davis opined that King "appears to be able to understand some simple,

verbal instructions but would have significant difficulty understanding more complex and written instructions." Doc. 7-1 at 26. In this regard, the ALJ found that, "[i]n understanding, remembering, or applying information, [King] has moderate limitation." Doc. 7-1 at 29. The ALJ found that "Dr. Davis stated that the claimant appears able to understand more simple, verbal instructions," and that "Dr. Blanton opined that the claimant has only mild limitation in understanding and remembering simple instructions and only a moderate limitation in understanding, remembering, or carrying out complex instructions." Doc. 7-1 at 29. Accordingly, the ALJ found that King has "moderate limitation . . . considering his allegations and his low IQ score," but that "the reports regarding his activities and retained abilities and the opinion evidence do not support a finding of greater than moderate limitation in this area." Doc. 7-1 at 29–30. Because there "is such relevant evidence as a reasonable person would accept as adequate to support" the ALJ's finding (*see Crawford*, 363 F.3d at 1158), substantial evidence supports the ALJ's finding that Dr. Blanton's opinion of King's mild to moderate intellectual disability was consistent with the record as a whole.

Thus, the ALJ's findings with respect to Dr. Blanton's opinions were based upon the proper legal standards and supported by substantial evidence. *See Lewis*, 125 F.3d at 1439.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **AFFIRMED**.  The court separately will enter final judgment.

**DONE** and **ORDERED** this September 13, 2024.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE